# Timothy McMahon and Ann McMahon, his wife, Appellants, v. James Thornton, Jr.

*Easement—Rule as to surface drainage of city lots.*

The rule laid down in Bentz v. Armstrong, 8 W. & S. 40, that the agricultural rule of drainage as between servient and dominant tenements cannot apply in cities and towns, has never been departed from.

In the cities a lot owner in improving his lot must arrange to conduct the natural drainage, arising from rain or other causes, directly from it to a sewer or other appropriate place for the receipt or discharge of the same. It must not be turned or led or permitted to flow upon the lot of an adjoining owner. Failure to provide for such surface drainage will result in a cause of action to an adjoining owner.

Argued April 28, 1897.   Appeal, No. 127, April T., 1897, by plaintiffs, from judgment of C. P. No. 2, Allegheny County, Oct. Term, 1895, No. 757, on verdict for defendant.   Before RICE, P. J., WILLARD, WICKHAM, BEAVER, REEDER, ORLADY and SMITH, JJ.   Reversed.

Trespass.   Before EWING, P. J.

The facts sufficiently appear in the following charge of the court below:

Timothy McMahon and Ann, his wife, have brought suit against James Thornton, Jr., to recover damages for injuries to their house.

The plaintiffs and the defendant own lots adjoining each other, over in the hill district of Allegheny.   The McMahon lot fronts twenty-two feet on Carrie street; the Thornton lots fifty feet on Carrie street, and they run back one hundred and fifteen feet to a ten foot alley.

Mrs. McMahon has owned this house about three years, from August, 1893.   It was built some time before that.   She says, and her witnesses say, that the cellar has become damp; that there is water in it at times ; that the wall is damp, and that the sill is rotten ; and she claims damages therefor, and alleges that Thornton is responsible.

In the first place, banish from your minds the idea that you have to start out with the assumption that, because somebody's

house is wet, or somebody has suffered injury, somebody else is responsible for it, and liable to pay for the damage. That is not the case; there must be proof to establish that.

The plaintiffs allege that the water comes through from the lots of Thornton to their lot.

There does not seem to be much dispute or difficulty in determining the natural lay of the ground. It is steep. The street in front, Carrie street, descends at a grade, as the engineer says, of about ten feet in one hundred—ten per cent; an illustration of how people may be mistaken about cuts and distances and so on, for Captain Thornton, no doubt honestly, says he thought it was about two feet out of every six; but, at any rate, it is a steep grade down. Then, the lots lie below Carrie street, and descend pretty rapidly, until, if I understand, a little more than past the center, and then ascends again to the alley. The evidence seems undisputed that this central low part was an old spring run, the ascent not being very high to the alley, which was on a ridge, and then the ground descending again. It was on a pretty steep hillside—steep in both ways; and that water flowed, in the natural state of the lots, from the Thornton lot, and from above the Thornton lot, down this valley on to the McMahon lot.

[If this were in the country, the rule would be well established, and an old one, that the lower property has to submit to the flow of that water. The owner of the lower lot cannot be allowed to dam it up and stop it and turn it. But, when you come to small lots in a city, laid out as this is, then the rule changes, and the party below is not bound to submit to that flow of water. He may dam it up. If he can put a dam or a wall there, that will keep it from flowing on to his lot, he may do it and make the people above take care of their water in some other way; but the people above are not bound to stop the water and keep it off him, if it is a natural flow. If the party owning the lower lot wants to keep the water off his lot, he must make a wall, or dam, or something, so tight that it will not let the water through. He cannot call on his neighbor above to keep the water off him. The neighbor above cannot gather water in great quantities and put it off in a different place, but he is allowed to let it go as it would naturally go, whether it be a spring or the natural rain water that falls on the lot.] [1]

In this case the plaintiffs own the lower lot. The evidence shows that the central portion of the lots along there has been filled in in many of the lots, certainly in these two, so as to make a gradual slope from the front street back to the alley; and the front street is sewered so low that it appears that it will drain from the back, and even drain the cellar of the house on the alley. There is no sewer in the alley. If there were, it would be much more easily arranged.

[Now, let us see what were the rights of these small lot holders as to each other. The owner of the upper lot had a right to level his lot and put it higher than the lot below; and he had a right to put it higher than the natural surface; but, in doing so, he must not throw the earth over on the lower lot—he has to protect the earth. That, however, is substantially all he is required to do. If water percolates through the earth on to the lower property, the upper owner is not responsible; if spring water, or if rain water, soaks through onto the lower lot, the lower lot must take the consequence, or else the owner must protect himself.] [2]

Now, according to the testimony, Thornton built three houses in the front, which connect with the sewer. The yards back of those houses have sewer drops, each of them, that connect with the sewer; and, it seems, that now he has a house fronting on the alley, on the far side of his lot from the McMahons, and he connects the cellar in that house with the sewer, and still it is wet.

[Mr. Thornton had a right to build a wall of stone or brick or wood, or any other substance, right to the line. If the owner had built to the line, he had a right to build against him. He had no right to encroach on the other's lot, but he had a right to build a wall to protect the elevation that he had made in leveling his own lot. But, in doing so, he should not throw water on that lot that would not naturally flow on it. But, if he built his wall so as to protect the earth from falling in on the other lot, built it on his own ground, even if it were ten feet high, if he kept up the earth, that was his right. It was his duty to be careful in building it, so as to have it substantial, so that it would stand. Instead of building a stone wall, he built what, in the country, we used to call a "crib." He had a log eight feet back in the hill, then a log on the ground, and a tie

between them, fastening them, and so on up, until he built his log wall some four feet high at the lowest place and four and one half at the highest; a little higher back from the alley, because, as I understand, this depression in the lots, or ravine crossing them, has not been filled up level, and he built it up and filled in back of it until the earth was nearly up to the level of the top log. Now the objection that I would have to that would be that Captain Thornton could better have spent more money for himself, and built a substantial stone wall that would stand for a long time, instead of the logs that would rot; but, unless the logs gave way, and if he did not build it over the line, he did not do anything that he had not a right to do, and if injury followed to those below it is the misfortune of their location. If he did not take water that would not naturally flow onto the other lot and throw it on, he is not responsible for the water getting through onto it. If he did, he would be responsible for the damages.] [3]

Now, we have a situation detailed to us about the springs that were originally in this vicinity, producing water that flowed constantly, as I understand, down this ravine, which the owners undertook to get under ground by a French drain, a thing which some of you probably know about and some do not. It was explained partly by the witnesses. It is a drain that works very well in the country, but it is not a drain which works very well in the city, unless you have it away below where other people are, water is liable to escape from it. Some of the witnesses call this springy ground, and others say it is not. Mr. Henderson, one of the owners, son of the Mr. Henderson who formerly owned the ground, says it was not springy, but yet he describes it as what I would call springy; and if there is a hill anywhere around in that locality that has not wet weather springs in that locality, I do not know of it. You have heard the testimony of the witnesses, though, and you will make up your minds from what they say.

Now, if the situation as Mr. Henderson explains it, and as numerous witnesses explain it, that, a short distance away, when digging for a well, they came to water a few feet below the surface; that numerous cellars around there are wet, sometimes dry when dug, and then, unexpectedly, water coming in, it is just what may be expected to occur on this sort of a hill any-

where; and a party building on a lower lot must expect, unless he takes unusual precautions, to have, at times, a wet cellar. [If I were going to provide for that lot, I would have dug a trench away below the foundation of the wall and filled it in with broken stone. If there were a sewer in the alley it could very easily be fixed, but, until that is done, it is not likely that they will ever have a dry cellar; and it is very natural, with the ground above it on one side and close to it, high up. The wall may be a little damp and be different from what it would be if it was out on an open street, but that is one of the things that a party has to expect if he builds a common wall in such a place, and I don't think the plaintiffs can claim damage for it.] [4]

Now, it seems to me that, with the evidence we have, you will find it very difficult to tell wherein Captain Thornton has neglected to perform his duties, or to exercise reasonable care, great care, in preventing the water from going down below on to the lower lot. If he did neglect his duty and damage occurred, · he is liable for the consequences. [The plaintiffs say the wall has been damp for two years, and that the sill has rotted. One of the witnesses says that, with a peculiar condition of the atmosphere, the sill might rot in two years. You have your own experience in regard to that. Damp alone, in my experience, will not rot a piece of sound timber in that time. If the air was as he describes it, it might. Foul air, or air containing substances that will eat the wood, will rot it; and there might be a dry rot; but mere damp will not rot a piece of wood that is sound, in that length of time.] [5]

The actual damage that they have suffered up to this time would be the measure of damages, not the cost of taking away this embankment—I will speak of that afterwards—and not necessarily the cost of putting in a new sill. You would have to find, to make that the measure of damage, that it was solely from the water that got in, and which Captain Thornton ought to have kept out. I have tried to explain to you his rights and duties, and the rights and duties of the parties below. We have constant suits between people who occupy lots in this kind of a situation, where the water is percolating through the earth, and will do so, in spite of any reasonable precautions on the part of those above; and it is simply the misfortune of the sit-

uation.   When people buy lots of that sort, they must expect to take them with their objectional features.

But there is another branch of the case in which there is a question of fact for you, and the witnesses differ.   Captain Thornton must put his wall on his own ground.   He may put it right against the other lot.   If the building on the other lot is at the line, he may build his wall right against it, and he is not liable for any damages.   But he must keep his wall on his own ground, and he must maintain it there ; that is, fairly there ; it must not go over to any considerable degree.   To illustrate : According to the testimony of Mr. Brown, the engineer who was examined this morning a part of McMahon's house (viz : the corner strip at the alley) is over on the Thornton lot a half an inch, at eight feet above the ground.   He says it is not plumb; that below it is not over.   Well, now, that is a very trifling thing, and I do not think a jury would give damages if Captain Thornton should sue the McMahons for trespass on his lot, because the corner strip extended over a half an inch.   The plaintiffs' witnesses say that these logs are over on McMahon's property, and the defendant's witnesses say they are not.   The engineers differ slightly, and very slightly.   The plaintiffs' engineer says that at the end away from the alley the logs are over.   The engineer for the defendant says they are not, and the difference between them is probably a quarter of an inch. Some of the witnesses say they are away over, and Mr. Mc-Mahon says that the wall was two inches away from his line when the house was built; then, some of the witnesses for the defendant say that it is two inches now from the wall to the house, and they say that you can see between them.   Mr. Mc-Intyre says that he stood at the alley, at the McMahon house, and he could look clear through and see clear through, and the defendant's witnesses say that there has a board fallen down between at one place that, to some extent, obstructs the view.

[Now, granting that the fence, or the log wall, was over on its own side, and the McMahon house built on its own side, this narrow space of two inches would fill up with dirt that would fall there, in time.   Now, it is his duty to keep that space open, if practicable.

By Mr. Mead : Whose duty ?

By the Court : The duty of McMahon, if he wanted it that

way. Mr. Thornton was not bound to go over and examine and look into that little space every week or day or month. He was bound to use care not to let the earth down where he had built it up above its natural level, but for things that came in there casually, by children throwing them in, or the wind blowing them in, or things of that sort, he was not responsible. It seems to me that the question as to whether these logs are over on the McMahon lot or not is the principal question, as to whether you should find for the plaintiff or the defendant; and in no case, as I can see, is there room for much more than a mere nominal verdict for plaintiff, or, on the other side, for the defendant.] [6]

The testimony incidentally does show that Mr. McMahon is one of those unfortunate men who are liable to be imposed on, and therefore he necessarily goes into a fight, but he is entitled to his rights notwithstanding. The significance of the questions put was to know if he had not been complaining of water coming down from above, and if he had not sued the former owner of the Thornton lot, before this earth was filled in.

Take the case, gentlemen, and, small as it is, give it a fair consideration, and render the verdict that you think the testimony requires.

By a Juror: Have we anything to do with the amount of damages?

By the Court: If you find for the plaintiffs, you find the amount of damages, and if you find for the defendant, you say nothing about it.

Plaintiffs' counsel excepts to charge and bill sealed for plaintiffs.

Verdict and judgment for defendant. Plaintiffs appealed.

*Errors assigned* were (1–6) to portions of the judge's charge, reciting same.

*F. C. McGirr* of *Marron & McGirr*, with him *A. E. Goss*, for appellants, relied upon Bentz v. Armstrong, 8 W. & S. 40; Kauffman v. Griesemer, 26 Pa. 407.

*K. T. Meade*, of *Hudson, Meade & McCue*, for appellee.

OPINION BY REEDER, J., July 23, 1897 :

As early as Bentz v. Armstrong, 8 W. & S. 40, it was held that the agricultural rule of drainage as between servient and dominant tenements cannot apply in cities and towns. There can be no question that it is the well-settled principle of law in this state that in agricultural land, the natural flow of water from lands of a higher upon those of a lower level cannot be made the subject of an action for damage. But a different rule applies in towns and cities, for if the agricultural rule were to be applied to building lots, there could be no adapting the surface of uneven portions of a city or town to buildings by the filling and the grading of the lot.

In the case already referred to, Justice KENNEDY says : " It has ever been understood, and such has been the practice and usage too, that the natural formation of the surface will and indeed must necessarily, undergo a change in the construction of the buildings and other improvements that are designed and intended to be made. In doing this it would seem to be right that the common benefit and convenience of the respective owners of adjoining lots should be consulted and attended to. . . . It is of great importance that the water upon each lot arising from rain or other causes should be conducted by the owner thereof if he wishes to have it removed directly from it to a sewer or other appropriate place for the receipt and discharge of the same, and not to be turned and led upon the adjoining lot without the consent of the owner. And it appears to be the duty of the owner of each lot if he improves it, to do it in such a way as to lead and conduct the water that happens to flow or be on it off in the way just mentioned without regard to the original formation of the lot." As was said in Davidson v. Sanders, 1 Pa. Superior Ct. 432, " this enunciation by the Supreme Court has stood without qualification or limitation for over fifty years. It seems to have been so universally accepted as a correct exposition of law, that the Supreme Court has in no case since that been called upon to reconsider the question of the right to recover by one lot owner in the city or town for injury to his property by an adjoining property owner who has built upon and improved his lot, by the flowing of surface or rain water from the one to the other."

While each owner of a lot has the right to grade his lot in

any way which is most convenient to himself, yet if in the grading of the lot he leaves his lot above that of the adjoining lot owner and supports the earth used in the filling and grading of his property by a retaining wall, he must so construct his retaining wall as to inflict no injury upon the adjoining owner; and if the material which he uses for the purpose of retaining the earth used in the filling and grading of his lot is of such a character that it permits the water from his lot to flow through it upon the adjoining property, thereby injuring his neighbor he is liable in an action for damages for whatever injury is occasioned thereby. While the right exists to make his lot conform to his own comfort and convenience, he has no right in the altering of the surface of the land, to do that which will injure his neighbor's property. He must in such alteration of the land, when changing it from the face that nature has put upon it to conform to his own idea of that which is desirable, take care of all the water that falls or flows upon the land and conduct it off the new surface adapted to his own fancy in such a way as will cause no injury to the adjoining tenements.

This evidently was not the conception of the law held by the court below, as evidenced by its charge. As adapted to the facts in this case, the portions of the charge assigned for error in the 1st, 2d, 3d, 4th, 5th and 6th assignments are erroneous, and the assignments must be sustained.

Judgment reversed and a venire facias de novo awarded.